## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SUSAN CONSTANT,             )
                                  )
               Plaintiff,      )
                                  )
             v.           )      02: 03cv1706
                                  )
MELLON BANK, N.A.,        )
                                  )
             Defendant.    )

### MEMORANDUM OPINION AND ORDER OF COURT

July 3, 2006

       Presently before the Court for disposition is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendant Mellon Bank, N.A., and the brief in opposition filed by Plaintiff, Susan Constant. After careful consideration of Defendant's motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Susan Constant, on her claim of retaliation under the Family and Medical Leave Act.   Therefore, the Court will grant the motion for summary judgment of Defendant, Mellon Bank, N.A.

### PROCEDURAL BACKGROUND

       Plaintiff Susan C. Constant ("Plaintiff") brought this lawsuit under the Family and Medical Leave Act  ("FMLA") on November 7, 2003,  in which she alleges that Defendant Mellon Bank N.A. ("Mellon") illegally terminated her employment in retaliation of her request to take FMLA leave.

Mellon has filed the instant motion for summary judgment in which it contends that Plaintiff is unable to establish a *prima facie* case of retaliation under the FMLA.  In the alternative, Mellon contends that assuming *arguendo* that Plaintiff could state a *prima facie* case of FMLA retaliation, summary judgment should still be granted in its favor because there is no evidence that Mellon's legitimate, articulated reason for Plaintiff's discharge (poor performance) was false and that Plaintiff's request for FMLA leave was the real reason for her discharge.

## FACTUAL BACKGROUND

The facts relevant to this discussion, and viewed in the light most favorable to Plaintiff, are as follows.   In February 2002, Plaintiff was hired by Mellon as a Marketing Specialist III in its Corporate Marketing Department.  As a Marketing Specialist III, Plaintiff worked on a variety of internal and external marketing and communications projects, often in conjunction with other Mellon employees.  Plaintiff's supervisor throughout her employment with Mellon was Peter Hayes, Director of Marketing for Mellon.  Mr. Hayes reported to Rose Cotton Gabbianelli, Senior Vice President and Director of Corporate Affairs for Mellon.

On May 26, 2002, Plaintiff and her husband were arrested at their home after they were involved in a domestic dispute which resulted in a Mt. Lebanon police officer being shot. Plaintiff was arrested and charged with conspiracy to commit attempted murder, conspiracy to commit aggravated assault, recklessly endangering another person, and obstructing the

administration of justice.[1]  Following Plaintiff's arrest, she was incarcerated for five days in the

Allegheny County Jail, after which she returned to her job at for Mellon.    As a result of her

arrest, Plaintiff missed four days of work; however, she used four vacation days for the work

days that she missed.

Plaintiff testified during her deposition that Mellon was supportive of her following

her arrest and return to work.  After she returned, Mr. Hayes advised her that she needed to

maintain a professional demeanor and keep her personal issues outside of the workplace.

Plaintiff worked in a cubicle which had no door and was in close proximity to co-workers.

During the time period following her release from jail, it was necessary for Plaintiff

to occasionally attend court hearings and meet various court/bail requirements, such as court-

mandated drug and alcohol testing, preliminary hearings, and meetings with her attorney,

during the work day.  Also, Plaintiff testified that she frequently discussed her legal situation

with her co-workers during work hours and made personal calls from work to discuss her legal

situation (including calls to her counselor and her attorney).  *See Pl. Depo. at 41-42.*

The record reflects that in the four months following her arrest, Plaintiff was absent

from work on no fewer than twenty-two (22) separate occasions and that Mellon granted her

permission to miss work on each of these occasions.  *Pl. Depo. at 46-57, Pl. Depo. at 56-57,*

*Exhs. 1-14.*  In her deposition Plaintiff testified that she was not disciplined as a result of any of

these absences.

---

[1]    The felony charges filed against Plaintiff were dropped by the District Attorney's
office prior to a preliminary hearing; the misdemeanor charges were resolved
through the Allegheny County Court of Common Pleas program of Accelerated
Rehabilitative Disposition.

3

On August 7, 2002, Mr. Hayes met with Plaintiff for her 2002 mid-year performance review.  According to Plaintiff, Mr. Hayes complimented her work on the CFI website and on the branding brochures she had written, but he also advised her that she needed to minimize the number of personal telephone calls she made from work and informed her that she spoke loudly on the telephone.  *See Pl. Affidavit at ¶ 7; Pl. Depo. at 59.*  Plaintiff agreed to minimize her personal calls.  *Pl. Depo. at 59*.

Two days later, on August 9, 2002, Mr. Hayes met with Plaintiff and again specifically asked her not to make telephone calls from her desk about her legal situation, to reduce the number of personal calls in general, and to lower her voice during those calls so as not to disrupt her co-workers.  *Pl. Depo. Exh. 15*.

During the week of October 7, 2002 Plaintiff made several personal calls from her office, which apparently disrupted the workplace.  *Pl. Depo. Exh. 15*.  As a result, on November 4, 2002, Mr. Hayes issued a disciplinary memo to Plaintiff which stated the following:

RE:  Corrective Action/Initial Warning

The purpose of this memo is to notify you that you are being placed on the first stage of corrective action due to disruptive and inappropriate behavior in the workplace.

As you will recall, when you returned to work in June, it was clearly stated to you that you must maintain a professional demeanor, keep your personal issues outside the workplace, and avoid discussing your personal situation with coworkers while in the workplace.  However, within a few weeks you began to conduct personal conversations over the telephone that were clearly overheard by others in the department (including myself), as well as raising the topic of your personal situation with others in the department.  You were reminded of the requirement to separate your personal and professional activities while in the workplace during your

4

> mid-year review on August 7th, and, on August 9th we held a separate
> conversation in which I specifically asked you not to make telephone calls
> from your desk to discuss your personal situation, and to minimize your
> personal calls (and to be sure they couldn't be overheard if personal calls
> were made).  I also reminded you that these activities were not acceptable
> and that if I were forced to raise the issue again you would be placed on
> corrective action.
>
> It is now clear that during the week of October 7th you made repeated
> personal calls which have been overheard by others, and have caused
> inappropriate and unnecessary disruption in the workplace.  As a result,
> you are being placed on corrective action/initial written warning.
>
> This memo formally initiates the corrective action process.  If immediate
> and sustained improvement is not shown, additional steps will be taken, up
> to and including termination of your employment at Mellon.

*Pl. Depo. at 62-63, Ex. 15.*  Following this written warning, Plaintiff once again agreed to

curtail her personal calls while at work.  *Pl. Depo. at 65*.

    The summary judgment record reflects that Plaintiff did not file any complaint

regarding the November 4, 2002, corrective action/initial warning with Human Resources or

Mellon management because she felt it was "justified."  *Pl. Depo. at 66.*

    On December 13, 2002, Plaintiff once again engaged in a loud and disruptive

personal conversation at work.  *Pl. Depo. at 66-67.*  This conversation was overheard by

Plaintiff's co-workers, who complained about the conversation and one of her co-workers

allegedly was so upset by the conversation that she left work.  *See Depo. of James Lauteri at

15-16; Hayes Depo. at 71-73.*

    On January 27, 2003, Mr. Hayes met with Plaintiff for her year-end performance

review and evaluation.  In the section titled "Comments on Year End Assessment" on Results-

Based Goals, Mr. Hayes wrote:

Susan met all of her goals for 2002 and exceeded them in some cases, especially in the case of the marketing communications items.  She was directly responsible for the development of the sector brochures to support the brand campaign, and completed this difficult assignment on time, despite a variety of hurdles including the need to work with a variety of departments and personnel to gain the approvals needed to print the brochures.  In addition Susan has started to provide other writing support to the department to help offset the increasing requests for marketing writing that are being made through Design and Video.  Susan was also instrumental in getting the CFI web site up and running and in maintaining it over the course of the last 9 months of the year.

*Pl. Depo, Exh. 16 at 3.*

In the year-end evaluation, Mr. Hayes also noted, however, that Plaintiff "needed improvement" in the category of "Integrity"[2] and noted:

Overall Susan was effective at demonstrating the shared values, however there are some areas that require continuing attention and work.  While Susan can provide excellent work at times, her work is sometimes marred by haste and a lack of attention to detail.  This can be corrected with a better focus on self editing and learning to proofread her own work.  The value of integrity is in question only because Susan has struggled to keep some very difficult personal circumstances out of the workplace, as professionals are required to do.  However Susan has show (sic) improvement in this area and there are signs that this issue will pass in time.

*Pl. Depo, Exh. 16 at 5.*

During the annual review, Plaintiff identified a "Competency to Be Developed" as "[i]mprove attention to detail."  *Id.*  The strategy identified by Plaintiff to meet this goal was to "[r]un spell check; print and proof hard copy" and "[w]hen possible, proof after 24 hours."  *Id.*

---

[2]     "Integrity" is defined as "[h]ow we respect and treat with dignity our customers, clients, shareholders, communities and each other.  Being honest, fair, active listeners, open communicators, and accountable."  *Pl. Depo., Exh. 16 at 4.*

6

During her deposition, Plaintiff testified that proofreading was "part and parcel" of the position as Marketing Specialist III. *Pl. Depo. at 71-72.*

Plaintiff filed no complaint or objection to her 2002 annual Performance Review.

On April 10, 2003, Plaintiff's husband was involved in a car accident, in which he sustained serious personal injuries. On April 23, 2003, Plaintiff spoke to Mr. Hayes about her possible need to take FMLA leave to assist her husband, who was not allowed to drive and could only be in a car to go to/from medical appointments. On April 25, 2003, at 3:09 PM, Plaintiff sent an email to Mr. Hayes formally requesting FMLA leave and asking Mr. Hayes to contact Human Resources for her. Mr. Hayes replied by email the same day at 4:07 PM and told Plaintiff that he would contact Human Resources and also asked Plaintiff to give him the "details on when you want to start, how long you'll be gone for, etc." *Exh. D. to Pl's Affidavit.* According to Plaintiff, later that evening, she spoke with Mr. Hayes and told him that she would like to take the FMLA time in half-day increments, but Mr. Hayes told her that "she would need to take FMLA time in full, contiguous days and could not take it in non-contiguous half days." *Pl's Br. at 7-8 (citing Pl. Affidavit at 28-29; Pl. Depo. at 88,89).*

Plaintiff alleges that on April 28, 2003, Mr. Hayes called her at home and asked about her FMLA plans. She told him again that she wanted to use the FMLA leave in non-contiguous, half-day segments. "He acrimoniously insisted that he would only allow her to take the time in full, contiguous days." *Pl's Br. at 8.* She asked that he check with Human Resources and, if he was correct, "she would come up with a way to accommodate that requirement." *Id.*

On May 5, 2003, Mellon Benefit Administrator Angelo Gnazzo sent Plaintiff the requisite FMLA paperwork.  Plaintiff had the Certification of Health Care Provider form completed by her husband's treating physician on May 15, 2003, and returned the form to Mellon.  In the Certification of Health Care Provider form, Plaintiff indicated that she needed "time off to transport husband to/from medical appointments.  Typically, this will require 1/2 day absence per appointment.  I am estimating that he will require no more than 20 appointments, including diagnostics."  *Pl. Depo., Exh. 20.*

On May 23, 2003, Angelo Gnazzo informed Plaintiff that her intermittent leave request under FMLA had been approved.  *Pl. Depo., Exh. 21.*  Plaintiff testified that she was allowed to take all requested FMLA leave time while she was employed by Mellon.  The record reflects that Plaintiff took two days of FMLA time in May, one and a half days of FMLA time in June 2003, and had requested to take off two days in July 2003.  *Pl. Depo., Ex. 24.*

Plaintiff did not file any complaints with Mellon Human Resources or Mellon Management over any difficulties with her utilization of FMLA time.  In fact, Plaintiff testified that she was allowed to take all of her FMLA leave time in half-day increments as she had originally requested.

Plaintiff contends that "[u]p until the end of April, 2003, [she] had received no communications - either verbally or in writing - that advised her that there were issues with her work performance."  Pl's Br. at 6.  However, the summary judgment record evidence reflects that this allegation is not accurate.  For example, Mr. Hayes testified during his deposition that he observed continued  problems with Plaintiff's performance, such as:

8

a.     With regard to a database that Plaintiff compiled comparing Mellon to its competitors, Mr. Hayes testified:  "We found we had issues around the typos that were in it and we've continued to find them over the last year.  So, there were mistakes in spelling, business line attribution, things like that."  *Hayes Depo. at 29;*

b.     With regard to brochures that Plaintiff worked on, Mr. Hayes testified: "We had standard boilerplate describing Mellon that we had difficulties with, I ended up having to revisit.  There were mistakes in revision that kept creeping back in . . . . We also, on the asset management one, [Plaintiff] couldn't get to a resolution with the line of business about a description of MIAM, acronym for Mellon Institutional Asset Management, so it ended up being written by Guy Hudson in conjunction with myself."  *Hayes Depo. at 29-30.*

c.     With regard to a brochure, Mr. Hayes testified that Plaintiff's type caused the entire brochure to be reprinted.  *Hayes Depo. at 30.*  Specifically, Plaintiff referenced a "Bank Le**n**der Study" when she should have referenced a "Bank Le**a**der Study." *Id.*

d.     With regard to CFIdeas, an internal Mellon newsletter, Mr. Hayes testified that Plaintiff had several problems in content and style.  *Hayes Depo. at 32.*  According to Mr. Hayes, Plaintiff's problems were so severe that Shawn Bannon, a Mellon Communications Specialist, was assigned to edit Plaintiff's work.  *Hayes Depo. at 31-32.*

e.     With regard to an overview Plaintiff prepared on pension funding, Mr. Hayes testified that Plaintiff had problems with organization of material and with her writing, which "tended to be rambling."  *Hayes Depo. at 37.*

f.     With regard to Plaintiff's role in negotiating the SkillSoft contract, a contract with an external training provider, Mr. Hayes testified that Plaintiff did not keep him properly informed of the contract status and left him very little time to review the contract before it had to be signed.  *Hayes Depo. at 158-63.*[3]

---

[3]     Plaintiff testified at  her deposition that on April 30, 2004, Mr. Hayes yelled at her for signing the contract to renew services between Mellon's Corporate Marketing Department and SkillSoft.  Plaintiff alleges that Mr. Hayes told her that she had no authority to sign the contract, that she had not kept him informed, and that she had overstepped her bounds by binding the Corporate Affairs Department.  *Pl. Depo. at 87.*

Ms. Cotton, the Senior Vice President and Director of Corporate Affairs for Mellon, testified that she also noted continued problems with Plaintiff's work.   At least twice in the spring of 2003, Ms. Cotton met with Plaintiff to discuss problems with her writing.  *Cotton Depo. at 15*.  At the first meeting, Ms. Cotton discussed content and quality of writing issues with Plaintiff's work on CFIdeas; at the second meeting, Plaintiff's work on CFIdeas was again the topic.  *Cotton Depo. at 16, 26.*

The summary judgment record also reflects that Ms. Cotton and Mr. Hayes were not the only people critical of Plaintiff and her work.  For example, Beth Moore, Manager of Employee Communications in the Corporate Affairs Department, testified that she considered Plaintiff to be an "average writer" who employed a "heavy use of jargon."  *Moore Depo. at 6, 12*.  Ms. Moore also stated that Plaintiff would stop by to chat during work hours instead of working.  *Id. at 20.*

Shawn Bannon, Assistant Vice President and Communications Specialist in the Corporate Affairs Department, testified that he was "uncomfortable" working with Plaintiff. *Bannon Depo. at 14.*  He further testified that he complained on several occasions about the quality of Plaintiff's work.  *Id. at 15-17.*[4]

_____

[4]        Specifically, Mr. Bannon testified as follows:

> Primarily, I complained about the quality of writing I was receiving from [Plaintiff].  I also discussed with Beth [Moore] that I was not comfortable working with [Plaintiff].
>
> * * *
>
> With [Plaintiff's] writing, there were constant style issues, the writing did not adhere to The Mellon Style Guide or Associated Press Style Guide. There were redundancies in the text that, in my opinion as an editor, didn't say much.  The writing, I felt, was not well organized and generally, from a
>
> (continued...)

Dean Kniola, Marketing and Research Manager for Mellon, testified that Plaintiff "was somewhat irritating to work with" and that with Plaintiff "there were quite a bit of curse words and, you know, always followed by a perfunctory, pardon my French or something like that . . . .[When] she became a little irritated herself at situations or individuals, the shits and damns and what have you would come out." *Kniola Depo. at 3, 8, 22.*

James Lauteri, Brand Manager for Mellon, testified that he received complaints about Plaintiff's personal calls at work from Plaintiff's co-workers on several occasions, including after the December 13, 2001 telephone call in which Plaintiff admittedly spoke very loudly. Mr. Lauteri testified that after the December 2001 telephone call, Plaintiff's co-workers were "very uncomfortable and they left" the office. *Lauteri Depo. at 5, 15, 16-17.*

Deborah Guydish, Corporate Manager of Learning and Development for Mellon, worked with Plaintiff in connection with the negotiations of the SkillSoft contract. Ms. Guydish testified that she was concerned during negotiations that Plaintiff was asking for provisions in the contract that "were not industry standards, and we shouldn't be pursuing them." *Guydish Depo. at 29-30.* Based on her concerns about Plaintiff's involvement with the SkillSoft negotiations, Ms. Guydish asked "corporate" to become involved in the negotiations.

Lastly, Mary Ann Gera, who is not a Mellon employee, but rather the SkillSoft representative who negotiated the contract with Mellon, testified that "Plaintiff came up with ideas that are not part of our business practice. She was interested in getting Mellon licenses

---

[4](...continued)
style standpoint, sloppy.

*Bannon Depo. at 15, 18.*

that people can exchange into and out of.  And we don't just do things like that."  *Gera Depo. at 23*.  Ms. Gera also testified that Plaintiff's request for floating licenses "[m]aybe in the short term" negatively affected the relationship between Mellon and SkillSoft.  *Id. at 24*.

On June 2, 2003, Mr. Hayes gave Plaintiff a corrective and final warning, which provided:

RE:  Corrective Action/Final Warning

The purpose of this memo is to notify you that you are being placed on the final stage corrective action due to chronic and repeated failure to meet the work requirements of your job.

The second and final stage of corrective action is warranted because you are already on initial corrective action for inappropriate behavior in the workplace in regard to keeping your personal issues outside the workplace and the need for you to maintain a professional demeanor, per the correction action memo you signed on November 24, 2002.  This final corrective action builds on the November memo and addresses the work-related issues and an overall decline in performance and productivity.

The following work-related issues are the basis for this corrective action.

1.  An inability to meet the writing requirements of the communicator's position.  Despite being hired as a writer and communicator, the work you have produced lately has deteriorated in quality until recent projects have required repeated rewrites from senior management.  In addition, requested changes are sometimes not included or are inserted without regard for how they impact text flow and grammar (an issue that is a chronic problem and was discussed and noted in your 2002 performance review).  In addition, you have demonstrated a lack of knowledge about the correct formatting for certain kinds of basic communications, specifically newsletters and white papers, and demonstrated an inability to consider and choose the right ways to present information so that it is understandable and useful to readers.  As a communications specialist, these activities are all core requirements of your job position and grade.

2.  Unclear communication/Lack of keeping management informed.  On repeated occasions you have provided confusing verbal or unclear written information to your supervisor and clients that has misled their

understanding of situations or activities.  Specifically, you have continually shown an inability to articulate key issues and to communicate those issues effectively.  Sending a data-laden e-mail without context, identifying key issues or warning of upcoming deadlines is *not* informing management.  Examples of this tendency are the recent inability to raise key issues to management during the SkillSoft negotiations, not providing a clear explanation of the dating issue to MIAM on the placemat project (despite knowing the business issues involved with the dating for MIAM), the lackadaisical approach to identifying roles and responsibilities for sectors vs. Corporate Marketing on the development of Sector Capabilities Brochures, and the misleading way that you introduced your request for FMLA (by asking for "significant" time off, then asking for two weeks off, only for me to discover via an e-mail that the request was actually for 6 half days).

3.  Poor business judgment.
Your decision to agree to a three-year contract extension with SkillSoft without first obtaining approval from you (sic) supervisor showed a glaring lack of business judgment.  This decision forced Mellon into a three-year contract with corresponding financial obligations when you did not have the authority to make budget decisions.  This followed numerous discussions between you and me about the lack of quality in SkillSoft product set and the need to reevaluate the product, indicating that you chose to renew the contract despite clear knowledge of some of the failures of the program and a management predisposition not to renew the contract.

I will continue to support you and to assist you in remediation of your performance deficiencies.  However, please be aware that substantial changes and improvements are required to successfully perform your job duties.

This memo formally initiates the final stage of corrective action. If immediate and sustained improvement is not shown, or if other problems arise, additional steps will be taken, up to and including termination of your employment at Mellon.

*Pl. Depo, Ex. 17.*

The following day, on June 3, 2003, Plaintiff requested a meeting with Mr. Hayes to discuss the June 2 warning.  On June 4, 2003, Mr. Hayes met with Plaintiff as requested.

13

During the June 4th meeting, Mr. Hayes explained, *inter alia*, that Plaintiff's writing had deteriorated and that he had received a complaint from an internal Mellon customer about Plaintiff's handling of a situation.  The issue of Plaintiff's request for FMLA leave was not discussed.

Plaintiff contends that Mr. Hayes and others at Mellon became much more critical of her written work after she requested FMLA leave.  For example, the June edition of CFIdeas required at least seven drafts and the letter to Mellon managers regarding SkillSoft that Plaintiff had prepared required multiple drafts.[5]   Mellon alleges that because Plaintiff's performance had not improved and the same problems continued to exist, Ms. Cotton and Mr. Hayes made the decision to terminate Plaintiff's employment.  Plaintiff was informed of that decision on June 30, 2003.

### STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  *Anderson v. Liberty*

---

[5]      In support of her position, Plaintiff relies upon the opinion of her expert witness, Arthur J. Marino, an adjunct Associate Professor at Point Park College, who has opined that the various changes "were not made for lack of quality in the writing," but rather the changes made by Mr. Hayes and others were "arbitrary."  It is the opinion of Mr. Marino that Plaintiff's writing "meets or exceeds the qualifications for a professional writer's post."  *Expert Report of Arthur J. Marino, at 32.*

*Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere

scintilla of evidence in its favor" in order to overcome a summary judgment motion.  *Williams*

*v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S.

at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory

allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Id.*

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the

summary judgment standard requires the non-moving party to create a "sufficient disagreement

to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.


### DISCUSSION

As stated above, Plaintiff claims that she was terminated from her employment in

retaliation for her request to take FMLA leave.  Mellon responds that it is entitled to summary

judgment because (i) Plaintiff cannot state a *prima facie* case of retaliation under the FMLA;

and (ii) assuming *arguendo* that Plaintiff could make out a *prima facie*, Mellon had a

legitimate, nondiscriminatory business reason  for terminating Plaintiff's employment.   The

task of the Court is not to second-guess employment decisions, but is instead to determine

whether the employment decisions were motivated by an illegal discriminatory purpose.  *Ezold*

*v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 526-27 (3d Cir. 1992), *cert. denied,* 510

U.S. 826 (1993).

A.        Prima Facie Cause Under the FMLA

The FMLA  provides up to twelve workweeks of unpaid leave during a

twelve-month period for certain family reasons and any serious health condition that makes the

employee unable to perform the functions of his position.  29 U.S.C.  § 2612(a)(1).  The statute
expressly prohibits an employer from retaliating against an employee for exercising his or her
FMLA rights.  29 U.S.C. § 2615(a)(2).

To establish a *prima  facie* case of retaliation under the FMLA, Plaintiff must
establish that (1) she took an FMLA leave, (2) she suffered an adverse employment decision,
and (3) the adverse decision was causally related to her leave.  *Conoshenti v. Public Serv. Elec.
& Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).  Once a plaintiff makes out a *prima facie* case,
the usual *McDonnell Douglas*[6] burden shifting framework is implicated.  *See Weston v.
Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001).  Accordingly, the plaintiff bears the initial
burden of presenting a *prima facie* case.

Mellon concedes that for purposes of this motion, Plaintiff has met the first two
prongs of her  *prima facie* case.  However, Mellon argues that Plaintiff cannot meet the third
prong because Mellon brought Plaintiff's performance problems to her well before she
requested FMLA leave in late April 2003.

Plaintiff does not deny that performance problems had been brought to her attention
before she requested FMLA leave, but she contends that after she requested the FMLA leave,
Mr. Hayes and others at Mellon became much more critical of her written work.  For example,
Plaintiff contends that within days of requesting the leave, Mr. Hayes required rewrites,
involving multiple drafts, of the previously approved *CFIdeas* newsletter.  "Within five days of
Ms. Constant receiving certification for FMLA, Mr. Hayes issued to Ms. Constant a corrective
action/final warning, raising for the first time serious issues about her writing, her

_____

[6]        *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

16

communications with management and her business judgment." *Pl's Br. at 3.* Approximately two months following her FMLA leave request, Plaintiff's employment was terminated.

The Court notes that while the timing of the relevant disciplinary actions and termination are relevant factors in assessing causation, timing alone is not usually sufficient to establish the causation prong in a claim for retaliation. *See Helfrich v. Lehigh Valley Hospital*, 2005 WL 670299, at *19 (E.D. Pa. Mar. 18, 2005) ("[E]xcept in circumstances where the timing of the alleged retaliatory act is 'unusually suggestive,' timing alone is never sufficient to demonstrate a causal link between the termination decision and an exercise of FMLA rights." (*citing Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). *But see Baltuskonis v. US Airways*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999) (six days between FMLA and termination sufficient to show causal connection). In *Helfrich*, the trial court held that "when an employer expresses concern about an employee's performance deficiencies prior to the time the employee engages in allegedly protected activity, no retaliatory inference arises." *Helfrich,* 2005 WL 670299, at *20.

In this case, the summary judgment record is clear that Mellon's complaints about Plaintiff's performance deficiencies and workplace misconduct existed well before Plaintiff requested any leave under the FMLA. Although Plaintiff argues that her managers became much harsher on her written work after she requested FMLA leave, the Court finds and rules that the summary judgment record is utterly devoid of any evidence which supports her contention in this regard. Rather, Plaintiff relies upon her own "unsupported assertions, conclusory allegations, or mere suspicions." Such unsubstantiated speculation is not sufficient

17

to withstand summary judgment. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005).

The Court finds and rules that, in light of Plaintiff's continuing performance deficiencies, the timing of the adverse employment action ( i.e., Plaintiff's employment termination) in relation to the dates when leave was requested and taken, is not "unusually suggestive," so as to permit timing on its own to establish causation in this case. Rather, the Court finds that the timing is not "unusually suggestive," since it is virtually impossible to distinguish  between the various uncontested performance deficiencies cited by Mellon and the "harsher" criticism Plaintiff allegedly received after she requested FMLA leave.

Because Mellon has presented uncontested evidentiary facts which establish that the proximity of Plaintiff's termination in relation to her leave was actually the result of performance deficiencies, the Court finds that Plaintiff's "timing" argument is not sufficient on its own to establish causation in this case.  Therefore, Plaintiff is unable to establish the third prong of a *prima facie* case of retaliation under the FMLA.


B.      Plaintiff Has Produced No Evidence of Pretext

Assuming *arguendo*, however, that Plaintiff could establish a *prima facie* case of FMLA retaliation, the Court finds and rules that summary judgment for Defendant would still be warranted because Plaintiff cannot establish that the legitimate, non-discriminatory reason articulated by Mellon for the discharge of Plaintiff was pretextual.

As noted above, Mellon's "burden at this stage is 'relatively light:  it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the

defendant need not prove that the articulated reason actually motivated the [action].'" *Krouse v. American Sterlizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997) (*quoting Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).

The summary judgment evidence which bears upon Plaintiff's workplace misconduct and performance deficiencies clearly demonstrates that the problems with her performance were documented months before Plaintiff requested FMLA leave.  Additionally, the summary judgment record reveals that not only Mr. Hayes, but also several other Mellon managerial employees, including Rose Cotton Gabbianelli (Mellon Senior Vice President and Director of Corporate Affairs), Beth Moore (Mellon Employee Communications Manager), Dean Kniola (Mellon Marketing and Research Manager), Jim Lauteri (Mellon Brand Manager), Shawn Bannon (Mellon Communications Specialist) and Deborah Guydish (Mellon Corporate Manager of Learning and Development), observed and/or commented upon Plaintiff's problematic performance and/or behavior.

Accordingly, the Court finds that Mellon has articulated a legitimate non-discriminatory reason for Plaintiff's termination from employment.  The burden then shifts to Plaintiff to provide specific evidence that Plaintiff's discharge was a pretext for a decision that was actually based on Plaintiff having requested FMLA leave.

To withstand summary judgment, Plaintiff must adduce specific facts from which a reasonable factfinder could either: (i) disbelieve Mellon's articulated non-discriminatory reason; or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause for its decision.  *See Fuentes*, 32 F.3d at 764.

Based on the evidentiary record before it, the Court finds and rules that Plaintiff has simply failed to present any evidence to establish that her request for FMLA leave was a factor in the decision of Mellon to terminate her employment. The record is replete with references to Mellon's documentation of Plaintiff's work misconduct and performance deficiencies well before Plaintiff requested FMLA leave in late April 2003. Plaintiff has not demonstrated any weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the preferred legitimate reason for Mellon's actions. *Keller v Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108-09 (3d Cir. 1997). Accordingly, summary judgment will be granted to Mellon on Plaintiff's claim of retaliation under the FMLA.

## CONCLUSION

For the reasons hereinabove set forth*,* and viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation under the Family and Medical Leave Act. Therefore, the Court will grant the motion for summary judgment filed by Defendant Mellon Bank, N.A.

In the alternative, the Court finds that Plaintiff has failed to establish that the legitimate, non-discriminatory reason(s) articulated by Defendant Mellon Bank, N.A. for Plaintiff's discharge was a pretext for retaliation. Accordingly, the Motion for Summary Judgment of Defendant Mellon Bank, N.A., will be **GRANTED**. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SUSAN CONSTANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 03cv1706 |
| | ) | |
| MELLON BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER OF COURT**

**AND NOW**, this 3rd day of July, 2006, in accordance with the foregoing

Memorandum Opinion, it is **ORDERED, ADJUDGED AND DECREED** that the Motion for

Summary Judgment filed by Mellon Bank, N.A. is **GRANTED** and Judgment is hereby entered

in favor of Defendant Mellon Bank, N.A.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:      Gary M. Davis, Esquire
Email: gdavis@acba.org

John-Mark Turner, Esquire
Sheehan, Phinney, Bass & Green
Email: jturner@sheehan.com

Catherine S. Ryan, Esquire
Reed Smith
Email: cryan@reedsmith.com

John C. Unkovic, Esquire
Reed Smith
Email: junkovic@reedsmith.com